## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 19-cr-0335 (ECT/HB) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Miguel Venegas Velazquez (02) and Alberto Rafael Olvera, Jr. (03), | |
| Defendants. | |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Miguel Venegas Velazquez's Motion to Suppress Evidence Obtained from Search and Seizure [Doc. No. 47], Motion for Severance [Doc. No. 48], and Motion to Consider Defendant's Pro Se Motion [Doc. No. 102]; and Defendant Alberto Rafael Olvera, Jr.'s Motion to Suppress Statements or Admissions [Doc. No. 58] and Motion to Suppress Search and Seizure [Doc. No. 59]. The motions were referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a)(3)(A). The parties' nondispositive motions were resolved by separate Order [Doc. No. 78].

### I.    Background and Procedural History

On December 19, 2019, Defendants Miguel Venegas Velazquez ("Venegas Velazquez") and Alberto Rafael Olvera, Jr. ("Olvera") were charged by Indictment with a third individual, Defendant Fernando Cevastian Duenas Banuelos ("Duenas Banuelos"), with one count of Conspiracy to Distribute Methamphetamine and Possession with Intent

to Distribute Methamphetamine and one count of Possession with the Intent to Distribute Methamphetamine on or about November 25, 2019.  (Indictment [Doc. No. 22].)  Olvera was charged with a second count of Possession with the Intent to Distribute Methamphetamine on or about December 7, 2019.  (*Id.*)

On January 16, 2020, Venegas Velazquez filed a motion to suppress evidence obtained from a search conducted on November 25, 2019, at 7xx Aurora Avenue in St. Paul, Minnesota.  [Doc. No. 47.]  Venegas Velazquez argued that the warrant authorizing the search was not supported by probable cause.  Venegas Velazquez also filed a motion to sever his trial from that of his co-defendants, based on a written statement provided by Duenas Banuelos that Venegas Velazquez had no involvement in the charged offenses.  [Doc. No. 48.]  On January 17, 2020, Olvera filed a motion to suppress statements he made to law enforcement officers on November 25, 2019, and December 7, 2019.  [Doc. No. 58.]  Olvera also moved to suppress evidence obtained from his cell phone and a tracking device placed on his vehicle pursuant to a search warrant obtained on December 2, 2019; and evidence obtained from a warrantless search of his person and luggage on December 7, 2019.  [Doc. No. 59.]  Duenas Banuelos also filed pretrial motions but later withdrew them.

The Court held a hearing on Venegas Velazquez's and Olvera's motions on February 21, 2020.  (*See* Mot. Hr'g Tr. at 1 [Doc. No. 81].)  With respect to Venegas Velazquez's motion to suppress evidence, the Government submitted the search warrant, affidavit, and return for 7xx Aurora Avenue (Gov't Ex. 3) for the Court's review. Venegas Velazquez's attorney also stated on the record that if Duenas Banuelos entered a

2

guilty plea, Venegas Velazquez's motion for severance would be moot. (Mot. Hr'g Tr. at 14.)[1] With respect to Olvera's motions, the Government submitted a recorded statement by Olvera to law enforcement on November 25, 2019 (Gov't Ex. 1); a recorded statement by Olvera to law enforcement on December 7, 2019 (Gov't Ex. 2); a search warrant for Olvera's cell phone (Gov't Ex. 4); a search warrant for a tracking device on a 2016 Chevrolet Malibu (Gov't Ex. 5); and a search warrant for Olvera's duffle bags and backpack (Gov't Ex. 6). The Government also called Drug Enforcement Administration Special Agent Christopher Hage to testify. At the conclusion of the hearing, the parties requested and received leave to submit post-hearing briefing on the disputed issues.

Olvera filed his post-hearing memorandum on March 16, 2020 [Doc. No. 84]. Since no evidence was seized as a result of the vehicle tracking warrant (Gov't Ex. 5), he abandoned that argument. He persists in his challenges to evidence seized from his cell phone, the two statements he made to law enforcement, and evidence seized from his duffle bags and backpack. Venegas Velazquez filed his post-hearing memorandum on March 23, 2020. [Doc. No. 86.] The Government filed a joint memorandum in response to both Defendants' memoranda on March 25, 2020. [Doc. No. 89.]

On April 3, 2020, Venegas Velazquez filed a pro se Addendum to Suppression Motion, seeking "to challenge the validity of the search warrant as it pertains to the 'no-knock' search warrant." [Doc. No. 97.] He contends that officers who executed a warrant signed by a state court judge violated the knock-and-announce requirement of

---

[1] Duenas Banuelos entered a guilty plea on February 27, 2020. [Doc. No. 75.]

18 U.S.C. § 3109, and that he was unlawfully seized during a traffic stop on November 25, 2019, the date 7xx Aurora Avenue was searched. Because Venegas Velazquez is represented by counsel, the Court advised him by letter dated April 6, 2020, that it would not consider the motion unless it was filed by counsel. [Doc. No. 101.] Venegas Velazquez's lawyer filed a Motion to Consider Defendant's Pro Se Motion to Suppress Evidence and to Permit Otherwise Untimely Filing on April 8, 2020 [Doc. No. 102], as well as a supporting declaration [Doc. No. 103]. The Government filed a written response to the motion on April 16, 2020. [Doc. No. 108.]

## II.    Venegas Velazquez's Motions

### A.    Motion to Suppress Evidence

Venegas Velazquez seeks to suppress evidence obtained during the search of 7xx Aurora Avenue in St. Paul, Minnesota, on November 25, 2019. He argues that the search warrant was not supported by probable cause.

#### 1.    Facts Averred in the Supporting Affidavit

The Honorable Mark Ireland, Ramsey County District Judge, issued a search warrant for the upper west-facing unit of 7xx Aurora Avenue, Saint Paul, Minnesota, on November 25, 2019. (Gov't Ex. 3.) Minnesota Bureau of Criminal Apprehension Special Agent Anthony Fletcher provided the supporting affidavit for the warrant, which set forth the following facts.

Agent Fletcher was a member of a multi-agency task force investigating a suspected large-scale methamphetamine drug trafficking organization (DTO). In the three weeks before Agent Fletcher applied for the search warrant, he learned from a Drug

4

Enforcement Agency (DEA) special agent in Kentucky that a DTO in Minnesota was trafficking several hundred pounds of methamphetamine monthly from California to Minnesota. The Kentucky agent provided phone numbers to Agent Fletcher for the suspected drug traffickers in Minnesota and said they were connected to the Cartel Jalisco Nueva Generacion (CJNG) drug cartel. Agent Fletcher learned through personal investigation that one of the phone numbers was connected to an active drug investigation in Minnesota and another number was connected to an active drug and money laundering investigation in New York. Agent Fletcher obtained phone subpoena responses for the numbers and identified several individuals and residences. He and other officers conducted surveillance at the addresses and observed activity consistent with drug trafficking.

In the week before the search warrant was obtained, Agent Fletcher observed an individual believed to be the leader of the DTO arrive at 7xx Aurora Avenue. He was carrying a backpack. 7xx Aurora Avenue is a four-unit apartment complex with secured front and back doors. Two other suspected DTO members arrived at the quadruplex soon thereafter in a black Chevrolet Malibu with dealership plates and a 21-day temporary registration sticker. All three individuals went inside. Officers spoke with a mail carrier and learned that mail was being delivered only to Unit #2 of the complex. Other officers on the scene saw another suspected member of the DTO—known as "Kilo Venegas" on Facebook—leave the apartment complex carrying a package, walk to the street, and meet with a red Dodge Charger. "Kilo Venegas" apparently got into the Charger, which then traveled around the block; officers saw him exit the vehicle without the package and

5

reenter the complex.  The owner of the red Charger was identified and was already

known to law enforcement as the target of another methamphetamine investigation.

Agent Fletcher believed that "Kilo Venegas" had given methamphetamine to the owner

of the red Charger.

Officers continued surveillance of 7xx Aurora Avenue saw three Hispanic men

leave the building, get into the black Malibu, and drive away. Officers followed the car as

it stopped at several banks, which Agent Fletcher described as consistent with suspicious

banking activity.  Specifically, DTO members are known to "layer" large deposits of cash

in order to avoid detection by law enforcement and banks.  Eventually, the officers

conducted a traffic stop, and the occupants of the Malibu were identified as Olvera and

"Miguel Olvera," both of whom were believed to be upper level drug traffickers.  The

person who produced an identification in the name of "Miguel Olvera" was known to law

enforcement as "Kilo Venegas."

On "Kilo Venegas's" Facebook page, Agent Fletcher saw "Kilo Venegas" holding

handguns and showing gang signs.  "Kilo Venegas" also claimed to be employed by the

"Cartel" and a member of the "Sureno 13" gang for many years.  Agent Fletcher knows

gang members use weapons for protection against other gangs and to protect their

narcotics and drug stash houses.

During the investigation of the suspected DTO, officers often observed "Miguel

Olvera" drive vehicles with temporary registration stickers and little or no licensing, and

he would change vehicles weekly.  Agent Fletcher believes that was a tactic designed to

thwart detection by law enforcement.  Investigators also observed individuals believed to

6

be associated with the DTO come and go from 7xx Aurora Avenue at all hours of the day.

In the 72 hours before the warrant was obtained, Agent Fletcher spoke with Xcel Energy and learned that only one unit—the lower, west-side unit not believed to be related to the DTO—held an account. Officers believed the upper, west-side unit was being used by the DTO.

Twenty-four hours before the warrant was obtained, Agent Fletcher saw Miguel Olvera and other DTO members park and enter the front of the building at 7xx Aurora Avenue. One of the individuals was observed through an upper west window shortly thereafter. Officers also saw a car arrive and park outside the building; the driver remained inside. After about 10 minutes, officers saw a Hispanic male exit the building, walk to the trunk of the car, and retrieve a large red duffle bag from the trunk. The bag was three to four feet long and looked very heavy. The Hispanic male took the bag into the building without making contact with the driver of the car. Agent Fletcher believed the duffle bag contained drugs and that he had just witnessed a drug transaction.

Based on the above, Agent Fletcher believed "Miguel Olvera" was involved in the sale and distribution of narcotics and used 7xx Aurora Avenue to facilitate drug trafficking. Agent Fletcher further believed "Miguel Olvera" possessed firearms and had produced false identification during the traffic stop.

### 2.    Discussion

A search warrant must be supported by probable cause, supported by a sworn affidavit, and must describe with particularity the place to be searched and the items or

persons to be seized.  U.S. Const. amend IV.  The task of a judge presented with a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The affidavit must establish a "nexus . . . between the item to be seized and criminal behavior."  *Warden v. Hayden*, 387 U.S. 294, 307 (1967).  There must also be a nexus between the contraband and the place to be searched.  *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000).  "In dealing with probable cause, however, as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

Venegas Velazquez argues that Agent Fletcher's affidavit does not establish sufficient probable cause for the search warrant because there are no "obvious indicia of criminal activity."  (Venegas Velazquez's Mem. Supp. Mot. Suppress at 5 [Doc. No. 86].)  He lists several "intrinsically meaningless" details from Agent Fletcher's affidavit, such as the individual carrying a backpack into 7xx Aurora Avenue, the temporary registration sticker on the Malibu, a Facebook photo of Venegas Velazquez holding a handgun, and foot traffic entering and exiting the residence at all hours.  (*Id.* at 4–5.)  But the Court must make a practical, common-sense decision based on the totality of the circumstances described in the affidavit, not on individual facts.  *See United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995) ("The probable cause determination does not depend upon individual facts . . . .").  Moreover, "factors that individually may be

consistent with innocent behavior, when taken together, can give rise to reasonable suspicion"—or in this case, probable cause—"even though some persons exhibiting those factors will be innocent." *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011). And what appears to be innocuous information to a layperson can add up and amount to probable cause when viewed through the lens of a trained and experienced law enforcement officer such as Agent Fletcher. *See United States v. Cortez*, 449 U.S. 411, 418 (1981) ("[A] trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person."); *United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989).

Here, the totality of the circumstances described in Agent Fletcher's affidavit established a clear nexus between suspected drug trafficking activities and 7xx Aurora Avenue. Those circumstances include, but are not limited to, foot and vehicle traffic consistent with drug trafficking; the presence of suspected drug traffickers; the exchange of a package between "Kilo Venegas" and an individual in a red Dodge Charger who was the target of another ongoing methamphetamine investigation; the presence of the black Malibu at the residence and the Malibu occupants' subsequent suspicious banking activity; the traffic stop of the Malibu and identification of the occupants as Olvera and "Miguel Olvera," both suspected high-level drug traffickers; the photograph of "Kilo Venegas" holding a handgun and flashing a gang sign on Facebook, as well as the claim that he was employed by the "Cartel" and a member of the "Sureno 13" gang; and the large red duffle bag carried from the trunk of a car into the building with no communication between the driver and the recipient.

Venegas Velazquez contends that Agent Fletcher did not describe any blatant criminal activity but instead relied on information obtained from other law enforcement officers without corroborating that information. Venegas Velazquez cites *United States v. Warford*, 439 F.3d 836 (8th Cir. 2006), for the proposition that "allegations made by another law enforcement agent can be relied upon if they are corroborated by an independent investigation." (Venegas Velazquez's Mem. Supp. Mot. Suppress at 8.) But an informant—not a law enforcement officer—provided the information in *Warford*. 439 F.3d at 841. Unlike with an informant, an officer may rely on the collective knowledge of other law enforcement officers without independently corroborating the information provided, as long as there is some communication between the officers. *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993); *United States v. Stratton*, 453 F.2d 36, 37 (8th Cir. 1972). Agent Fletcher's affidavit establishes that he had ongoing communications with multiple other officers.

With respect to Venegas Velazquez's argument that the affidavit does not describe any obvious criminal activity, the Court reiterates that seemingly innocuous individual facts, when taken together, may give rise to probable cause, and that a trained and experienced law enforcement officer may draw inferences and make deductions that would elude a layperson. Moreover, a law enforcement officer may make reasonable inferences when drafting an affidavit in support of a search warrant. *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000). Likewise, the issuing judge may also draw reasonable inferences from the totality of the circumstances described in the affidavit in deciding to issue the warrant. *Id.* This Court finds the inferences of criminal activity

drawn by Agent Fletcher in the affidavit were reasonable, as were inferences of criminal activity the issuing judge would have drawn from the totality of the information described in the affidavit.

Even if the search warrant lacked probable cause, however, the Court finds that the good-faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897, 922 (1984), would apply. Venegas Velazquez has not shown that the judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," or that that the issuing judge "wholly abandoned his judicial role." *See id.* at 923. Nor were the affidavits so lacking in probable cause that reliance on them was objectively unreasonable, or the warrants so facially deficient that their validity could not be presumed. *See id.*

In accordance with the above, the Court recommends that Venegas Velazquez's motion to suppress evidence be denied.

### B.     Motion for Severance

The Court recommends that this motion be denied as moot. Venegas Velazquez's attorney represented on the record at the motion hearing that if Duenas Banuelos entered a guilty plea, Venegas Velazquez's motion for severance would be moot. (Mot. Hr'g Tr. at 14.) Duenas Banuelos entered a guilty plea on February 27, 2020. [Doc. No. 75.] Therefore, the motion for severance is moot.

## C.    Motion to Consider Pro Se Motion

Through Venegas Velazquez's pro se filing, he seeks to suppress evidence seized

pursuant to the 7xx Aurora Avenue search warrant on the ground that the executing

officers did not comply with the knock-and-announce rule enunciated in 18 U.S.C.

§ 3109.  The Government does not object to the motion as untimely or on procedural

grounds but argues it should be denied on the merits.  (Gov't Resp. Opp'n at 1–2 [Doc.

No. 108].)

> Title 18 U.S.C. § 3109 provides:
>
> The officer may break open any outer or inner door or window of a house,
> or any part of a house, or anything therein, to execute a search warrant, if,
> after notice of his authority and purpose, he is refused admittance or when
> necessary to liberate himself or a person aiding him in the execution of the
> warrant.

The statute codifies the "common-law principle that law enforcement officers must

announce their presence and provide residents an opportunity to open the door." *Hudson*

*v. Michigan*, 547 U.S. 586, 589 (2006).  *Hudson* held that even if the knock-and-

announce rule is violated, the remedy is not exclusion of the evidence that is seized.  *Id.*

at 592–94 ("What the knock-and-announce rule has never protected . . . is one's interest

in preventing the government from seeing or taking evidence described in a warrant.")

Venegas Velazquez's argument is foreclosed by *Hudson*.  Even assuming the

police violated the knock-and-announce rule, the officers still "would have executed the

warrant they had obtained" and seized the evidence inside the residence.  *See id.* at 592.

Any knock-and-announce violation had no effect on the validity of the warrant or the

search and seizure of evidence, and thus the exclusionary rule does not apply.  *Id.* at 594;

*see also United States v. Diaz-Ortiz*, 927 F.3d 1028, 1030 (8th Cir. 2019) (finding an alleged violation of § 3109 irrelevant to the seizure of a gun, drugs, and cash pursuant to a search warrant because the warrant was issued based solely on evidence obtained before the executing officers entered the residence). Therefore, regardless of whether the officers violated the knock-and-announce rule, they still would have obtained and executed the warrant and discovered the evidence seized from the residence. Accordingly, the Court recommends that Venegas Velazquez's pro se challenge to the admission of evidence seized from 7xx Aurora Avenue be denied.

With respect to Venegas Velazquez's argument that he was seized unlawfully during a traffic stop on the date 7xx Aurora Avenue was searched, there is no indication the Government intends to introduce any evidence or statements obtained as a result of the stop or seizure. The Court therefore recommends this aspect of the motion be denied as moot.

## III.    Olvera's Motions

Olvera seeks to suppress statements he made to law enforcement on November 25, 2019, and December 7, 2019; evidence seized from his cell phone pursuant to a search warrant; and evidence seized from his person and luggage pursuant to a search warrant.

### A.    Olvera's Statements on November 25, 2019

On November 20, 2019, law enforcement agents followed an unidentified man and woman to 7xx Aurora Avenue. (Mot. Hr'g Tr. at 23.) The man exited a vehicle, carrying a black backpack, and entered the building. (*Id.*) Venegas Velazquez later left the building carrying a blue bag and got into the back seat of a red Charger. (*Id.* at 23–24.)

13

Two individuals sat in the front seat. (*Id.* at 24.) After sitting in the car for a short time, Venegas Velazquez exited without the bag and went back into 7xx Aurora Avenue. (*Id.*) Drug Enforcement Administration Special Agent Christopher Hage believed he had witnessed a drug transaction. (*Id.* at 25–26.)

The building located at 7xx is a quadruplex with two units on the ground floor and two units on the upper floor. (*Id.* at 24.) The entry opens to a foyer; Units 1 and 2 are to the left and right of the foyer, and Units 3 and 4 are on the second floor of the building. (*Id.*) Unit 3 is located on the upper west-side of the building. (*Id.*) Surveilling officers could see people entering and exiting the building but could not see which unit they entered and exited unless the officers saw corresponding movement through a window. (*Id.* at 25.) At various times, officers had seen both Venegas and Olvera enter Unit 3. (*Id.*)

Later in the day on November 20, officers saw a single woman arrive at 7xx Aurora in an Uber; she was carrying a black bag and went inside the quadruplex. (*Id.* at 26.) In Agent Hage's experience, drug trafficking organizations frequently use Ubers to avoid detection. (*Id.*) After the woman went inside, three men left the rear of the building and got into a Chevrolet Malibu. (*Id.* at 27.) Agents followed the Malibu to a bank and saw the men go inside, which was significant to the agents because bank activity is associated with drug trafficking. (*Id.*) The men in the Malibu left the bank and ran a stop sign, at which time officers conducted a traffic stop and identified the three men as Duenas Banuelos, Venegas Velazquez, and Olvera. (*Id.* at 27–29.) Venegas

Velazquez produced a fake identification, however, in the name of "Miguel Olvera." (*Id.* at 29.)

The next day, November 21, the officer continued their surveillance of 7xx Aurora Avenue. They observed Venegas Velazquez leave the building and walk down the street with a black backpack, but they were not able to follow him. (*Id.* at 30.) On November 25, at about 1:10 p.m., police saw Venegas Velazquez arrive with a female and enter the building. (*Id.*) An Uber arrived, from which a man emerged and also entered the building. (*Id.* at 31.) Olvera arrived in a Malibu and carried a box of water bottles inside the building. (*Id.*) At 2:07 p.m., a grey Chevrolet Impala parked behind the building. (*Id.* at 31–32.) A man wearing a hooded sweatshirt exited the second floor of the building, opened the trunk of the Impala, and retrieved a large, red duffle bag that appeared heavy and unwieldy. (*Id.* at 32.) The man had no interaction with the driver of the Impala and took the bag into the building. (*Id.*) Investigators believed the bag likely contained drugs and decided to apply for a search warrant. (*Id.*)

Meanwhile, Venegas Velazquez and Olvera left 7xx Aurora Avenue in the Malibu. (*Id.*) Officers followed them to various stops and saw at different times a white bag in either Venegas Velazquez's or Olvera's hand. (*Id.*) Venegas Velazquez and Olvera met a vehicle in a parking lot and spoke with the driver; at the end of the exchange, the white bag was no longer in either of their hands. (*Id.* at 33.) Officers decided to pull over and detain Venegas Velazquez and Olvera for officer safety so that they would not disturb the execution of the warrant. (*Id.*)

The 7xx Aurora Avenue warrant was executed shortly thereafter. Police officers entered the upper west-facing apartment and noticed a bedroom on the southwest side and a bedroom on the northwest side. (*Id.* at 33–34.) They saw Duenas Banuelos packaging a large amount of crystal methamphetamine in the northwest bedroom; a Glock handgun was on the bed next to him, and the empty red duffle bag was also in the room. (*Id.* at 34–35.) Officers seized a total of 50 pounds of crystal methamphetamine in various rooms in the apartment. (*Id.* at 34.) They also seized another handgun and packaging material. (*Id.* at 35–36.)

Agent Hage interviewed Olvera immediately after the warrant was executed. (*Id.* at 38.) Agent Hage considered Olvera detained and advised him of his *Miranda* rights, although he did not intend to arrest Olvera that day. (*Id.* at 38–39.) Olvera agreed to speak with Agent Hage and two other officers at the scene, and he willingly answered their questions. (*Id.* at 40; *see generally* Gov't Ex. 1.) Olvera was alert and attentive, and he did not appear or sound intoxicated. (Mot. Hr'g Tr. at 40–41; *see generally* Gov't Ex. 1.)

Olvera seeks to suppress his statement to Agent Hage "because he believed giving a statement was necessary in order to be released." (Olvera's Mem. Supp. Mot. Suppress at 5 [Doc. No. 84].) He argues the statement therefore was not voluntary.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001). The Court considers "both the conduct of the officers and the characteristics of

16

the accused." *Wilson v. Lawrence Cty.*, 260 F.3d 946, 952 (8th Cir. 2001). Voluntariness is assessed under the totality of the circumstances. *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004).

The totality of the circumstances establish that Olvera's statement on November 25, 2019, was voluntary. Olvera was fully advised of his *Miranda* rights and willingly chose to waive those rights and speak with Agent Hage and the other officers. He never asked for a lawyer or to stop the interview. The interview lasted only about 20 minutes, and Olvera was released after the interview. Neither Agent Hage nor the other officers made any threats or promises to Olvera. To the extent any officer misled Olvera about the scope of the investigation or his suspected involvement, such tactics "will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *See Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) (noting that tactics such as deception, a raised voice, or a sympathetic manner do not *per se* render a confession involuntary). The Court has listened to the entire recorded statement and finds that Olvera's will was not overborne. No officer said, or even suggested, to Olvera that he had to speak with them in order to be released, and there is no evidence to support Olvera's argument that he actually believed he had to speak with the officers in order to be released. Having considered the totality of the circumstances surrounding Olvera's statements to law enforcement on November 25, 2019, the Court concludes Olvera's will was not overborne and his statements were voluntary.

17

### B.    The Cell Phone Warrant

Olvera seeks to suppress evidence obtained from a search warrant authorizing the installation and use of a Global Positional System (GPS) Technology on his cell phone, as well as the disclosure of subscriber, cell site, and call detail information.  (Gov't Ex. 4.)  Olvera argues the supporting affidavit failed to establish probable cause to believe he had any involvement in the criminal activity occurring at 7xx Aurora Avenue, and he contends he "was only present as a casual guest to smoke marijuana with one of the co-defendants."  (Olvera's Mem. Supp. Mot. Suppress at 7.)  Ramsey County Violent Crime Enforcement Team Investigator Daniel Gleason and DEA Task Force Officer Detsouk Vixayvong provided the supporting affidavit for the warrant (Gov't Ex. 4), which set forth the following facts.

As part of a joint investigation by Ramsey County and the DEA, on December 2, 2019, Officer Gleason learned from Officer Vixayvong about the search warrant that had been executed at 7xx Aurora Avenue.  Olvera had been seen exiting the building with Duenas Banuelos and Venegas Velazquez just before the search warrant was executed.  Fifty pounds of methamphetamine, packaging materials, and cash were seized during the execution of the warrant.  Though Olvera was seen at the residence, he denied being involved with the criminal activity.  Officer Gleason believed Olvera had a "significant role" in the narcotics trafficking operation, specifically, overseeing the narcotics and handling money for the DTO.  Olvera had told an officer that he was visiting from California, and Officer Gleason knew from training and experience that large-scale DTOs frequently send trusted individuals to oversee large loads of drugs and to collect money.

Officer Gleason also knew California is a source state for large shipments of narcotics. Olvera also told the officer he was at 7xx Aurora Avenue to visit a friend and smoke marijuana. He gave investigators his cell phone number before he was released.

An officer called Olvera's cell phone number on December 2, 2019, and he answered the phone. Officer Gleason learned that Olvera was not the registered subscriber of the phone number, which was consistent with his training and experience that narcotics traffickers commonly use fictitious names to register their cell phones. Within 72 hours before applying for the warrant, Officer Gleason learned from a "source of information" that Olvera remained in Minnesota and was attempting to sell narcotics. Officer Gleason believed Olvera was using his cell phone in furtherance of narcotics trafficking.

Considering only the information in Officer Gleason's affidavit and according the issuing judge "great deference," *Leon*, 468 U.S. at 914, the Court finds the information set forth in the affidavit sufficient to establish probable cause to believe that contraband or evidence of a crime would be obtained from the search warrant. It was reasonable to infer from the totality of the circumstances described in the affidavit that Olvera had more involvement in the DTO and narcotics trafficking under investigation than simply visiting 7xx Aurora Avenue as a casual guest to smoke marijuana with Duenas Banuelos and Venegas Velazquez. These circumstances include, but are not limited to, the amount of drugs and cash seized from 7xx Aurora Avenue; Officer Gleason's belief that Olvera had a significant role overseeing narcotics and handling money for the DTO; Officer Gleason's knowledge that large-scale DTOs often send trusted members to supervise the

drugs and money; Olvera's connection to California; Officer Gleason's knowledge that large shipments of narcotics frequently originate from California; Olvera's admission that he was visiting 7xx Aurora Avenue to smoke marijuana, an illegal activity; Officer Gleason's determination that Olvera was not the registered subscriber of the cell phone number he gave to police; Officer Gleason's knowledge that narcotics traffickers often register their cell phones under fictitious names; the tip to Officer Gleason that Olvera was still in Minnesota, attempting to sell narcotics, a week after 7xx Aurora Avenue was searched; and Officer Gleason's belief that Olvera was using his cell phone to traffic narcotics.

But even if the search warrant lacked probable cause, the good-faith exception to the exclusionary rule applies. Olvera has not shown that the judge who issued the warrant "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," or that that the issuing judge "wholly abandoned his judicial role." *See Leon*, 468 U.S. at 923. Nor were the affidavits so lacking in probable cause that reliance on them was objectively unreasonable, or the warrants so facially deficient that their validity could not be presumed. *See id.* Therefore, the Court recommends that Olvera's motion to suppress evidence seized pursuant to the cell phone warrant be denied.

## C.   The Statement and Searches on December 7, 2019

### 1.   Relevant Facts

Agent Hage testified that he chose not to arrest Olvera on November 25, 2019, because he wanted to develop additional evidence and further the investigation. (Mot.

Hr'g Tr. at 39.)  As part of that ongoing investigation, officers obtained the tracking

warrant for Olvera's cell phone and monitored its location.  (*Id.* at 41–42.)  On

December 7, 2019, Agent Hage noticed the cell phone in a new location—a hotel in

Roseville, MN known to law enforcement as a hub of criminal activity—the Key Inn.

(*Id.* at 42.)  Intending simply to look at the hotel registry, Agent Hage drove to the hotel.

(*Id.* at 42, 53.)  He was alone because it was not a preplanned operation.  (*Id.* at 46.)

When he drove into the parking lot of the Key Inn at about 8:00 p.m., Agent Hage saw

Olvera walking into the front door of the hotel.  (*Id.* at 42.)

Olvera was wearing a backpack, similar to backpacks other suspected co-

conspirators had been seen wearing.  (*Id.* at 44.)  Olvera looked at Agent Hage as he

drove past and did a double-take.  (*Id.* at 42.)  Agent Hage thought Olvera recognized

him from the November 25 interview and radioed other officers for assistance.  (*Id.* at

42–43.)  Agent Hage positioned himself by the front door of the hotel, and after about ten

minutes, he saw Olvera exit the hotel with "two, very large, fully-stuffed black bags" on a

luggage cart.  (*Id.* at 43.)  Agent Hage strongly suspected the bags contained drugs, based

on similar bags investigators had seen being brought in and out of 7xx Aurora and

Olvera's "close association with that apartment" and Duenas Banuelos and Venegas

Velazquez.  (*Id.*)  A car pulled up next to Olvera, and Agent Hage became concerned that

Olvera would flee and that the evidence in the bags would be lost, so he approached.  (*Id.*

at 43–44.)  The driver of the vehicle identified himself as an Uber driver, and Agent Hage

said he could leave.  (*Id.* at 44.)  Agent Hage then began talking to Olvera, who looked

very nervous and appeared to recognize the agent.  (*Id.*)  Olvera asked Agent Hage if he

had a warrant, which heightened the agent's suspicion of the bags' contents. (*Id.*) Agent Hage asked if he could look in the bags; Olvera was noncommittal, which Agent Hage interpreted as no. (*Id.* at 45.) Based on his suspicions, and for his safety and the safety of other people in the parking lot, Agent Hage decided to detain Olvera, place him in handcuffs, and seat him in the passenger side of the agent's unmarked car. (*Id.*) Agent Hage pulled the luggage cart with the bags next to his car as well. (*Id.* at 45, 59.) He did not lift the bags at that time but could tell they were very heavy. (*Id.* at 59.) After about ten minutes, another officer arrived, and Agent Hage advised Olvera of his *Miranda* rights. (*Id.* at 45.)

The following information is contained on Government Exhibit 2. Agent Hage started the conversation by telling Olvera he knew what was in the bags. Agent Hage asked Olvera if he could help himself, and Olvera asked how. Agent Hage vaguely described the evidence and investigation and said he would not ask any questions before reading Olvera his rights. Agent Hage said they could potentially work something out, depending on Olvera's level of cooperation. He then advised Olvera of his *Miranda* rights and asked if he was willing to answer questions. Olvera said he was, and he answered the agent's questions. At one point, Agent Hage asked if there was anything Olvera could do to help, and Olvera asked in response if there was any way he could walk away. Olvera later asked Agent Hage again what he could do to walk away that day. Agent Hage responded that the quantity of narcotics was too great and Olvera was not providing much information. The recorded portion of the interview ceased shortly thereafter.

Olvera did not appear or sound intoxicated during the interview. (Mot. Hr'g Tr. at 49; *see generally* Gov't Ex. 2.) He followed the questions and responded appropriately. (Mot. Hr'g Tr. at 49; *see generally* Gov't Ex. 2.) Olvera did not seem scared, but he was nervous and acted disinterested, as if he had nothing to do with the narcotics trafficking under investigation. (Mot. Hr'g Tr. at 68.) The interrogation lasted about 25 minutes.

Meanwhile, a drug-detecting canine officer arrived at the scene. (Mot. Hr'g Tr. at 50.) The dog alerted positively to the presence of drugs in the bags. (*Id.*) Agent Hage arranged for the drugs and Olvera's backpack, which Olvera had admitted contained drug money, to be transported to the DEA office. (*Id.* at 51.)

DEA Agent Amanda Grundeman applied for and obtained a search warrant for the bags. (Gov't Ex. 6.) The supporting affidavit described the execution of the search warrant at 7xx Aurora Avenue, Olvera's connection to the residence, the drugs and guns discovered inside the residence, Hage's encounter with Olvera at the Key Inn, Olvera's admission to Hage that the bags contained 50 to 80 pounds of methamphetamine, Olvera's statement to Hage that the backpack contained more than $10,000, and the canine officer's positive alert to narcotics in Olvera's bags.

### 2.  Discussion

#### a.  Whether Agent Hage Properly Detained Olvera

Olvera argues that Agent Hage had no legal justification to detain him or his property. The Court disagrees. Agent Hage had at least a reasonable suspicion that Olvera was engaged in criminal activity.

A police officer may briefly detain and question a person suspected of committing criminal activity. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S. at 417. An officer cannot act on an "inchoate and unparticularized suspicion or 'hunch,'" but " must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the nature and extent of the intrusion into the individual's Fourth Amendment rights. *Terry*, 392 U.S. at 21, 27.

"The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation omitted). Police may consider facts "based on their own observations, police reports, and patterns of particular types of lawbreakers." *United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993). Facts that would be considered innocent if viewed individually, "when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent." *Stewart*, 631 F.3d at 457. There is "no 'litmus-paper test' or 'sentence or paragraph' rule to determine when, given the 'endless variations in facts and circumstances,' police-citizen encounters exceed the bounds of mere investigative stops." *United States v. Jones*, 759 F.2d 633, 636 (8th Cir. 1985) (quoting *Florida v. Royer*, 460 U.S. 491, 506–07 (1983)).

Generally, "officers may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo' so that the limited purposes of the

stop may be achieved." *Id.* at 636-37 (quoting *United States v. Hensley*, 469 U.S. 221 (1985)). It is well-established that "police officers may reasonably handcuff a suspect and place him in a squad car during the course of a *Terry* stop in order to protect their safety and maintain the status quo." *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011).

When Agent Hage stopped Olvera in the parking lot of the Key Inn, he knew the following information. Olvera had been seen several times in the company of Venegas Velazquez, who was a suspected narcotics trafficker, and had been seen several times at 7xx Aurora Avenue, where more than 50 pounds of methamphetamine, guns, and large amounts of cash recently had been seized. Indeed, Olvera and Venegas Velazquez had departed 7xx Aurora only a few hours before the search warrant was executed. Agent Hage knew that individuals associated with the DTO under investigation frequently carried drugs and money in backpacks and duffle bags. He knew that an empty duffle bag was discovered next to the methamphetamine and a gun when the search warrant was executed at 7xx Aurora Avenue. Agent Hage knew that Olvera was at the Key Inn, a hotel known for criminal activity, on the night of December 7. When Olvera saw Agent Hage in the parking lot, he did a double-take and went inside the hotel. Agent Hage believed he had been recognized. When Olvera emerged from the hotel, he pushed two large, fully-stuffed black duffle bags on a luggage cart. Agent Hage strongly suspected the bags contained narcotics. When an Uber pulled up next to Olvera, Agent Hage became concerned that Olvera would flee and the evidence in the bags would be lost. Agent Hage knew that drug traffickers use Ubers to avoid detection by law enforcement.

When Agent Hage made contact with Olvera, he appeared very nervous and asked the agent if he had a warrant to search the bags, which added to the suspicion about the bags.

The Court finds the above information, along with the rational inferences that may be drawn from that information, reasonably sufficient to warrant Agent Hage's decision to detain and handcuff Olvera, place him in his car, and take control of the luggage cart. The information known to Agent Hage was specific and fit a known pattern of criminal activity. The nature of the information was also reliable, having been developed through first-hand observations of law enforcement officers and corroborated by the execution of the search warrant at 7xx Aurora Avenue. It was reasonable for Agent Hage to believe the heavy, cumbersome duffle bags contained narcotics and that Olvera intended to leave the hotel with the bags in the Uber had he not been detained. It was also reasonable for Agent Hage to believe Olvera could have a gun, in light of the weapons seized from 7xx Aurora Avenue.

Though Olvera identifies individual facts that when viewed in isolation might not support a reasonable suspicion—such as staying in a seedy hotel or refusing to consent to a search of the bags—the Court must consider the totality of the circumstances, not individual facts that would be considered innocent if viewed in isolation. *See Stewart*, 631 F.3d at 457. And upon considering the totality of the circumstances, the Court concludes Agent Hage had reasonable suspicion to detain and handcuff Olvera, place him in his car, and maintain control over the duffle bags so that he could "diligently pursue[] a means of investigation that was likely to confirm or dispel [his] suspicions quickly," *see United States v. Sharpe*, 470 U.S. 675, 686 (1985).

26

To that end, Agent Hage called for a drug-detecting canine officer to sniff the bags and, after administering a *Miranda* warning, asked Olvera if he would be willing to answer questions.  These are both within the bounds of a *Terry* stop.  Moreover, the positive alert by the canine officer and Olvera's admission that the bags contained drugs created probable cause to believe Olvera was involved in criminal activity.

Consequently, the circumstances of Olvera's detention did not violate the Fourth Amendment.

### b.      Olvera's Statement to Agent Hage

Olvera first argues his December 7 statement was a fruit of the poisonous tree because he was detained unlawfully.  (Olvera's Mem. Supp. Mot. Suppress at 5.)  The Court has concluded his detention was lawful, however, and thus this argument fails.

Olvera next argues his statement was involuntary "because he believed giving a statement was necessary in order to be released."  (*Id.*)  This argument is not supported by the facts adduced at the motion hearing.  Agent Hage never gave Olvera any reason to believe he would not be arrested that day, and there is no indication that Olvera believed he would be released.  Olvera asked Agent Hage what he could do to walk away that day, but Agent Hage responded there were too many drugs and not enough information.

To the extent Olvera argues his statement was not voluntary for other reasons, the Court finds his will was not overborne.  His statement was not extracted by threats or promises.  Agent Hage's conduct was not calculated to overcome Olvera's will, and it is clear from the recorded conversation that Olvera remained in full control of his resolve and answered only the questions he chose to.  Olvera's argument that he "must have

27

thought he could answer questions and be let go once again" (Olvera's Mem. Supp. Mot. Suppress at 6) is not supported by evidence or logic. Given the amount of drugs and money seized, there was little chance he would not be arrested; Agent Hage as much as told him so during the questioning.

With respect to Agent Hage's questions about whether Olvera could "help" himself by providing information, a statement is not rendered involuntary merely because an officer offers leniency. *See United States v. Astello*, 241 F.3d 965, 968 (8th Cir. 2001). The ultimate question is whether the suspect's will was overborne and his capacity for self-determination critically impaired. *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001). The Court finds here they were not. The totality of the circumstances supports a finding that Olvera's December 7 statements were voluntary, and the Court recommends that the motion to suppress the statements be denied.

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Miguel Venegas Velazquez's Motion to Suppress Evidence Obtained from Search and Seizure [Doc. No. 47] be **DENIED**;

2. Defendant Miguel Venegas Velazquez's Motion for Severance [Doc. No. 48] be **DENIED**;

3. Defendant Miguel Venegas Velazquez's Motion to Consider Defendant's Pro Se Motion [Doc. No. 102] be **GRANTED** in that the Court consider the pro se

motion, but **DENIED in part** and **DENIED AS MOOT in part** as to the relief requested in the pro se motion, as set forth fully herein;

4. Defendant Alberto Rafael Olvera, Jr.'s Motion to Suppress Statements or Admissions [Doc. No. 58] be **DENIED**; and

5. Defendant Alberto Rafael Olvera, Jr.'s Motion to Suppress Search and Seizure [Doc. No. 59] be **DENIED**.


Dated:  April 27, 2020                 s/ *Hildy Bowbeer*
                                       HILDY BOWBEER
                                       United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.